at L. Ms. Luzon for the appellant, Mr. Pincus for the appellate. Good morning. Good morning. Good morning. May it please the Court. There is no question. The legal standard that applies to the first-to-file issue before the Court is the Hampton material facts test. When this test is applied to the particular facts and circumstances of this case, the case is not barred by the first-to-file. Are we allowed to look beyond the complaints? Do we do something beyond just picking up the two complaints and looking at them? Your Honor, the standard, it's a jurisdictional issue. So, yes, to some extent, you can look at side of the pleadings. However… Well, let's get to the… Is it jurisdictional, first-to-file jurisdictional? Yes, Your Honor. What's your authority for that? Just the fact that the first-to-file issue is, it's a 12B1 issue. And the authority for that, I mean, I know the district court said it was, but what's the authority for that? Hasn't the Supreme Court given us some guidance on this, about the statutory jurisdiction? On… Do you have a case that says first-to-file is a jurisdictional issue? Not before me, Your Honor. Okay. Okay. But let me… Do you need it to be jurisdictional? Do you want it to be jurisdictional? I mean, for your legal purpose, not personally, but for your legal purposes, does it matter to your case whether it's jurisdictional or not? Whether it's a failure to state a claim? Sure. What matters, Your Honor, and it goes to your question, Judge Griffith, about do we need to look beyond the pleadings. In this particular case, we don't. The operative complaints… Do we need to look beyond the pleadings to determine whether the first-to-file bar holds? Can you… My understanding is yes. However, we don't need to in this case. What matters most is the Hampton test. And under the test, the analysis requires us to look first at the earlier-filed complaint and the later-filed complaint. When we're looking – when we apply that test to the complaints, and in particular the Wisconsin complaint, what we have is a complaint that is… Was there anything going on in Wisconsin that wasn't also going on nationwide? Your Honor, the Wisconsin complaint is a very limited complaint. It's a complaint about Wisconsin contracts. But the district court said, as I recall – and correct me if I'm wrong, I could be wrong on this – I thought the district court said that if you just scratch below the surface of the first complaint, you'll find the same set of facts that are alleged in the second complaint. Those aren't his words, but I think that's the gist of what he said. Is that right? There are two basic similarities between the Wisconsin complaint and our complaint here, but they're very superficial. The Wisconsin complaint involves E-rate violations. The Wisconsin complaint involves one AT&T subsidiary. But beyond that, there's not more. The Wisconsin complaint is materially different from our complaint in very important ways. First of all, it involved contracts specific between a Wisconsin company, Wisconsin Bell, and the Department of Administration. It involved misconduct with respect to Wisconsin sales representatives. Was it a different form of misconduct than is alleged in the second complaint? Yes, it is, Your Honor. I thought they were all the same. I thought they were all defrauding over the role of the LSP. In a very broad and general sense, there are similarities. Both cases are about E-rate. Both cases are about an AT&T company. But our case is materially different. All along, what we've alleged in our complaint here in D.C. is that AT&T Corp., the corporation, the parent, has engaged in corporate malfeasance. It's engaged in a failure to have policies for years relating to lowest corresponding price rates. Am I right that your Wisconsin case involved affirmative misrepresentations by, allegedly, by the Wisconsin Bell employees that are not at issue here? That is correct, Your Honor. And if the corporate failure to train that you allege here had been in place in Wisconsin, would it have necessarily prevented that misconduct because it involved separate affirmative misrepresentations by individuals? It may have. But what we've alleged in the Wisconsin complaint has nothing to do with corporate-wide policies of AT&T Corp., corporate malfeasance. That's a completely different theory of misconduct that gave rise to E-rate violations. Wisconsin is a limited case. It's limited to contracts. It's limited to breaches of contracts. It's limited to a Wisconsin entity. And it's limited to Wisconsin public schools and libraries. That's very distinct from the kind of misconduct that we're alleging here that gave rise to E-rate violations. What's the specific fraud that you've alleged? Your opponents cite Rule 9b and say you haven't made specific allegations of fraud. Where's the specificity? Where's the particularity in your ---- As to the particularity of what we've pledged, what we are required to plead is falsity of the claim. We've pled a longstanding ---- Don't you also have to plead individuals and time and place and circumstance? Yes, Your Honor. Who are the individuals? And we have. Who are the individuals? Name an individual. In terms of individual pleading, we've pled employees of AT&T Corp. We've pled specific subsidiaries. How many employees of AT&T Corp. are there? I don't think that meets the particularity requirement, does it? The particularity goes as to ---- Names. Names. Are there any names? There's no names, Your Honor, that we've pled. No names. Time and place? We've pled from 1996 on. And I think you did, you've alleged that it was, is it Form 474 or ---- Yes, Your Honor. There's several forms where we've pled specifically ---- Anything beyond that? Is that what you rest your allegations of specific fraud on, are those forms? No. No, our pleading is specific as to we've attached 2000 and 2007 and 2008 training manuals where we clearly specify that AT&T lacked LCP obligations and requirements in there. We've also pled a 2010 Detroit Public Schools audit wherein, even notwithstanding the belated 2009 implementation of policies that AT&T Corp. instituted, notwithstanding that in 2010 Detroit Public Schools were overcharged in excess of $3 million in services provided by AT&T. We've also pled, Your Honor, that AT&T breached a 2004 consent decree requiring E-rate program remedial measures. We've also pled state investigations occurring in 2009 in the states of Missouri, Indiana, Wisconsin, as to AT&T's E-rate violations. Maybe this is not for this Court. Maybe it's for ---- When your complaint talks about fraud problems in Missouri, Indiana, Connecticut, elsewhere, does that not raise a public disclosure bar issue? The public disclosure bar issue was raised below, Your Honor. That was not addressed by the Court. Is that jurisdictional? It's jurisdictional as well. Wouldn't we have to decide it if it were jurisdictional? It's an issue that was not raised below. And as to public disclosure issues, we've set forth in our briefing below, I think well stated, that the public disclosure bar does not apply to our case. Can you just explain quickly why? Because you just talked about three other jurisdictions where litigation was going after other related fraud by AT&T. In those investigations, Your Honor, AT&T Corp., the parent, is not specifically identified in those cases or in those investigations and in some of the documents underlying those investigations that became public. They're not specific to the allegations of fraud that we're alleging in our current case. During the time period at issue here that you're alleging, did Form 473 actually require affirmative statements about compliance with the lowest price requirement? Form 473 required that AT&T, yes, comply with E-rate obligations and LCP requirements. It also required that the eligible schools and libraries, the customers, in other words, of AT&T, attest to them being eligible. Who filed Form 473? I believe it's the library and schools. So they're attesting that AT&T gave them the lowest price or they're just attesting what AT&T charged them? Part of the process is that the schools have to be deemed LCP eligible or lowest corresponding price eligible. And to be a provider, you also have to say that you're providing schools LCP rates. You have to bid for that. So if you're providing services to schools that you knowingly, that you know are submitting forms and declaring their eligibility for LCP rates, you're providing those to the schools, then you're also attesting to the fact that you yourself are providing LCP rates to the schools. You're, in effect, affecting or facilitating the submission of false claims to the government. And that's our theory as to that particular form, Your Honor. Okay. Your time's up. We'll give you back two minutes. Thank you. Good morning, Your Honor. May it please the Court. The question on the first-to-file issue, as this Court has said in Batiste and Selko, is whether the second complaint alleges a fraudulent scheme that the government would have been equipped to investigate based on the first complaint. And we think the district court correctly held that that test is not satisfied here. Is it jurisdictional? The district court treated it as jurisdictional. We don't have any case law on that, do we? I don't. Not that I'm aware of, Your Honor. But as you know, the Supreme Court in recent years has narrowed the scope of what's jurisdictional for jurisdiction purposes. And I think it would be hard to say that this particular question comes under that rubric. So your position is it's not jurisdictional? We don't believe it's jurisdictional. How about the public disclosure bar? Under that same test, that fails, doesn't it? The amendment to the statute took the jurisdictional language out. So that can't be jurisdictional. I think that's right. I haven't looked at that issue, Your Honor, but I believe that's correct. Okay. So here the second complaint alleges precisely the same fraudulent scheme as was alleged in the Wisconsin complaint. How would I know if I were just looking at the Wisconsin complaint, working for the U.S. government, that that case involved anything other than a rogue actor? What indication of the Wisconsin complaint is there that there is a nationwide corporate failure to train? Well, I think two answers, Your Honor. I think as the district court held here where the complaint does allege this is a national program, that this is one subsidiary of a nationwide company that's engaged in the E-rate program, the question is what would a reasonable investigator do? Because it's a national program, which most federal programs are, and it's a subsidiary of a national company. Surely that is not enough to put me on notice that it's a national. Surely AT&T wouldn't take the position that every time some rogue actor in a belt somewhere in this country does something, because it's a subsidiary and maybe a national program is involved, they are now implicated in that fraud. I don't think that they take the position they were implicated, Your Honor. I think the question is what would the scope of a reasonable investigation be? And we think the district court correctly concluded. But here there's something more. There is the allegation in the second complaint that is quite specific in paragraph 28 on page 56 of the appendix that AT&T, and I'm quoting, completely controls the methods and terms of the operating companies. But we have to know from looking at the first complaint. Someone had to be on, I think that's our test. I don't think so. I noticed from the first complaint that there was a national fraud going on. I think your test, Your Honor, is would the investigation triggered by the first complaint encompass the allegations of the second complaint? And I don't think that requires you, especially in a situation where the same relator has filed both complaints, to ignore. Do you have a case for that? I mean, that stands to reason and that's what the district court said. But what's the authority for that?  I don't think this issue, frankly, has come up. But it seems to me that the relator here can't have it both ways. It can't say we've alleged in our second complaint this nationwide program where AT&T controls all of the operating companies and say, oh, but the investigation triggered by the Wisconsin allegations would not find this nationwide program. I think they have to take both, take their allegation. I guess I'm asking with some particularity, what exactly in the first complaint, the Wisconsin complaint, would let somebody know that this, again, is not a rogue problem confined to Wisconsin with its affirmative people making affirmative misrepresentations and that instead there's a collapse of corporate responsibility allegedly? Well, there are two answers, Your Honor. I think the district court, the question is not does the complaint itself delineate everything that could be found. That's the test the court explicitly rejected in SELCO. What the court said in SELCO was would a reasonable, would an investigation based on the first allegation trigger an investigation that would encompass the second complaint's allegations? Right, and what would trigger, you know, people have resources, what's going to let them know that there's any problem outside Wisconsin borders? Well, I think two things, Your Honor. I think they would look into the reason why Wisconsin engaged in wrongdoing. If it was, they would trace that down, and if there were a nationwide program, they would then look into it. What would be the nature of that investigation? How far would they have to go to trace that down? Well, based on the allegations of the second complaint, not very far, because the second complaint says that basically everything that is done with respect to E-rate billing and pricing is controlled by AT&T. Were we supposed to read the complaints in tandem to determine first or final? Well, I think in the circumstances presented here, where it is the same relator, it is reasonable to say that the relator's allegations, which presumably are satisfied Rule 11, are relevant in ascertaining what would happen if the Wisconsin investigation were undertaken. I'm not sure why the identity of the relator tells us anything about what the complaint would have put the government on notice of. So is your position as if it were a different relator bringing this national one? Well, I don't know whether it would or wouldn't, Your Honor, but I think, again, the case is pretty easy where it's the same. I think it's pretty easy where it's the same relator. It's a relevant factor for a legal test? I think it's relevant in whether this relator avoids the first to file bar to ascertain, to say where this relator is coming to the district court here and saying this is a nationwide scheme. That's why I don't have to allege any particulars. I can bring a complaint based on a nationwide scheme because I can allege in good faith that it is, and include, by the way, Wisconsin, Bell, amongst the defendants in that case and in the allegations that Wisconsin, Bell's actions were controlled by AT&T. And then say, but if the government undertook an investigation based on what I said in Wisconsin, it wouldn't possibly find this nationwide scheme. That just seems to me totally inconsistent, and you just can't have it both ways. Well, I'm going to go ahead. Selco involved allegations of corporate-wide fraud in the first complaint. Selco had an allegation that there was uniform pricing. It did not identify other agencies and other contracts. I understand, but the tip-off was there in Selco, whereas in this case it's not. Well, I think, Your Honor. The whole of them they had, as opposed to the Seventh Circuit, suggesting merely because you have a role does not mean to suggest that there's corporate-wide fraud. Well, I think two answers, Your Honor. I think that here where all of the operating companies are engaged in precisely the same program, I think the district court was correct in saying a reasonable investigation would look at whether what was going on in Wisconsin was going on somewhere else. But here I do think the allegation of the complaint in the second case is quite telling because what the second complaint says is this was all controlled by AT&T. If that is true. No, but what's telling is that the first complaint doesn't say that. Well, but the question, Your Honor, is what would, if the investigation. I'm asking you what's the tip to the government to suggest that this is corporate-wide. You keep saying you look at the second complaint. That doesn't make a lot of sense to me. Well, I have two answers. The district court didn't really place much reliance on the second complaint. What the district court said. But you are. Well, I'm placing reliance on both. I think there are two answers, Your Honor. I think that the district court correctly said a nationwide program, operating companies that do exactly the same thing in every state, a reasonable government investigator would look to see whether this was being duplicated elsewhere or whether it was triggered by a corporate-wide policy. That's where I have the problem with your position, or the question, I guess, at least not so much a problem is when the Wisconsin complaint says what's going wrong here is you've got individual sales representatives making specific affirmative misrepresentations. That seems like sort of isolated fraudulent activity by some bad actors. It's not alleging a failure to train at a nationwide level. It's just some bad apples in Wisconsin Bell. I think the complaint, Your Honor, is fairly red as alleging precisely the same Wisconsin-wide misconduct as the second complaint alleges nationwide misconduct, because the allegation is that there were false certifications and false representations regarding E-rates because the Wisconsin Bell people did not provide the LCP, the lowest corresponding tariff, and they instead withheld that information. That's precisely the allegation of the board complaint. But is that withheld? Is that they actually told, they lied to people, told them, allegedly, I know it hasn't been resolved yet. But that would always be true, Your Honor, because in all of these cases, there's an interaction between some sales representative and the E-rate recipient, and the AT&T or the service provider's representative says, here's our rate. And so that would always be the case in any of these situations. I would have thought that a fraud based on affirmative misrepresentations, X lied to Y, would be different than, oh, my gosh, negligence. They didn't train people so people didn't know and people just weren't even bothering to assert this, and then the company was signing off on this stuff without training its people, without being careful, without enforcing these requirements to go down. We don't know whether it was reckless or whether it was intentional. I think the second complaint, Your Honor, alleges precisely the same conduct, that there were false certifications. Do you have a case for us where a court has read the complaints in tandem to answer this question? I don't have a case where it has, and I don't have a case where it hasn't, Your Honor. But the test that this court and other courts apply, the question just hasn't come up. But then isn't the question, are we supposed to look at the first complaint, and from that, would the government have been tipped off to understand that there are allegations of a nationwide corporate conspiracy? And so let's just focus on the first complaint. What is there in the first complaint that tips the government off as to that allegation? Just the first complaint. In the first complaint, the fact that this was a nationwide program, that the complaint alleges, as is common knowledge, that this is one of many operating companies that are engaged in similar conduct across the country, would have tipped off a reasonable, as the district court agreed, would tip off a reasonable government investigator to look to see, given that exactly the same activity goes on in all these operating companies, to see whether there was some corporate-wide problem. Here, we think added to that is the fact that the second complaint says. But how is that? Back to the judgment of the legislature. Yeah. How is that? How would this complaint be different if it was just a rogue individual for Wisconsin Bell who was misbehaving? Would this complaint say anything different then? Well, the complaint, although it identifies one, what the complaint says is here's one. Surely you'll allow for that possibility, that in a nationwide program, there could be an individual acting on his or her own engaging in misconduct. And if this complaint said here there is one instance of misconduct, then maybe that would be true. But what this complaint says is there are E-rate contracts with many entities in Wisconsin, and there is a second contract which is with the Wisconsin government at a lower rate. Therefore, all of the E-rate agreements violate the LCP requirement. It didn't say there was one salesman or one place or anything. Let's just assume the complaint said Wisconsin Bell is rotten to the core. Obviously, all allegations here, but liars, thieves at every level, from the general forms that they're signing to the on-the-ground people, they're making misrepresentations. From that alone, we're going to bar a later discovery that, in fact, it wasn't just Wisconsin Bell that was rotten to the core. Company X had a pervasive culture of doing this. It seemed to me like very different arguments, and the one isn't going to necessarily lead to the other. You can have things that are just bad in one jurisdiction. You can, Your Honor. And I think the question here, in this particular situation where it's precisely the same government program that's operated nationwide, I think that's a difference. And where there is nothing in the Wisconsin complaint that identifies some one single bad actor in Wisconsin. But I do think, turning to what the relevance of the second complaint, I do think it's an odd situation. The question here is, what would an investigation based on the first complaint trigger? The relator says, in his representation to the district court here, that it would trigger finding a nationwide violation. No, but I think we don't look into, as I understand the test, it doesn't say if you pick up this complaint, you would then roll up your sleeves and spend six months to a year doing your own discovery and investigation. And if that would lead to it, it's barred. You really have to see, from the face of the first complaint, some arrows pointing, at least, in the direction of a bigger problem. We don't ask whether the government doing its own spade work after reading this complaint could find this bigger problem. Well, you have done that, and SELCO certainly says that, because what SELCO says is, we're going to look at this broader, we're going to bar this broader allegations regarding other agencies and other contracts, because we're going to assume that the government would have encompassed it, and Judge Hubell in the Foliart case did the same thing. So I think the question here really is, it wouldn't, based on the allegations that the relator has made, it would have been quite obvious that this was a wrongful conduct that was being centrally controlled, because the allegations of complaint number two say this very specifically. So it seems to me it would be a quite odd situation to say, yes, you can rely on those allegations to bring this complaint, but we have to close our eyes to them in determining what the government would have done based on complaint number one, when this very relator says the result of investigation number one would have inevitably led to the discovery of the broader conspiracy, because the directives that would have been found, the obvious first question that an investigator would ask is, so why are you doing what you're doing, and the answer, according to the allegations of the second complaint, is because these are the company-wide standards that we apply. So you're saying it's not going to take six months of spade work? It wouldn't take six months of spade work. It would take the first week of spade work to say, give us your documents, and the documents would be, based on these allegations, what the second, the corporate-wide policy. Would you take a minute and give us your 9-D argument in response to your friend's argument about specificity, particularly the fraud allegations? Sure. What this court has said is there has to be some specificity in Totten and other cases, time, place, and contents of the false representations. And what the courts have said is where there's a very broad conspiracy or broad set of violations alleged, they don't have to all be laid out there, but at least some representative ones have to be. You say the courts say that, but there's actually a circuit conflict on that issue, right? On whether there has to be at least one? Yeah, specificity, this person on this date, under the False Claims Act. Well, I think the degree of specificity, there may be a conflict, but I don't think there's a conflict that there has to be some specificity. Well, there has to be compliance with 9-B. I think we all agree on that. Well, let me give you an example. I think the relator relies on Judge Huvel's first decision in the Foliard case that addressed the 9-B issue and says she didn't require the identity of persons. That's true. But what was in that complaint was specifically 140 products that allegedly were being misrepresented and being purchased by the government, and the complaint alleged that the purchases happened so often that those 140 products, you could assume there was a purchase based on the false certification. Here, other than the general statement that every single form, 474, 473, has been false, there isn't even one specific comparison of one rate charged to an E-rate customer with a rate charged not to an E-rate customer, and that seems to us to be the minimum requirement of specificity. Otherwise, you can just say everything you've filed is false without any indication of what it is. Are you familiar with the position the Solicitor General took in the Nathan case? I think last term of the Supreme Court. No, I'm not. Okay, never mind. I won't ask you if your position is consistent. Do you happen to know if your position is consistent with the position of the United States on this? I don't know the position that he took. I'd be glad to look at it and advise the court afterwards. The second problem here is, is there really any representation or certification at all? As your Honor asked my friend, form 473 is filed by the service provider, but form 473 prior to July 2013 did not have a general representation about compliance, and we think it didn't really have any representation that's related to LCP. There were some quite specific representations as to other requirements, competitive bidding and other things, but nothing about compliance with this requirement. What about an implicit false certification? Well, I think the question is, who's making an implicit false certification? I think the argument would be form 473 is filed by the service provider. The other forms, 471 and 472, are filed by the recipient of the service. And as we laid out in our brief, we couldn't see anything that the recipient is certifying either about compliance that it has been told or that the service provider represented or any compliance with LCP. There are certifications there, again, about competitive bidding and about entitle eligibility of the recipient to receive the e-rate benefits, but nothing about the rate, the particular amount that it's being charged. So is your position if Company X, a very bad actor, Company X, is engaged in this program and consciously, deliberately, with lots of memos, says, we're going to stiff the government and these little libraries and charge them our highest price. And these forms were all getting filed, and they knew, they filed every form they did with the U.S. government, conscious of the fact that they were deliberately trying to rip them off. And they knew that they were charging prices that were then going to be reported by the libraries as this is the price we paid. That just wouldn't be fraud. It might be something else wrong with it, but it would not be fraud. Or an implicit false certification. Well, it might not be. It wouldn't be actually under the False Claims Act until the government did what it did in July 2013, which is to revise the form to require that kind of certification. It wouldn't even be an implicit false certification. There probably would be. I'm not familiar with the remedies. The administrator would probably have the ability to get the payments back. Why? I don't think there'd be nothing. On some contractual basis. Did your company have a contract with the government? Excuse me? Do you have a contract with the government on this program? I don't know. I believe that that's true, but I don't. Unless the court has any further questions. Thank you. Thank you very much. Thank you. There was a tip-off in Hampton. There was a tip-off in Selkow. To be clear, there's no tip-off in the Wisconsin complaint. Well, what's your answer to his response that they'd pick up the complaint and they'd go, huh, better get some papers, and then the papers would show? That's a highly speculative position. What's highly speculative, that the government would ask for the papers or that the papers would have revealed it? That the papers would have revealed it, Your Honor. That the allegations therein would have revealed and equipped the government to go, hmm, there must be something fishy going on with AT&T Corp. That's just not there. All we've got is references to E-Rate, background on E-Rate, as well as a named defendant who so happens to be an affiliate of AT&T Corp. If they had the first complaint and conducted the investigation, how would they have uncovered the nationwide conspiracy? I think we don't need to stray too far from the precedent in this circuit. In this case, imagine the Justice Department got involved and conducted the investigation. What would they have needed to do to find out what you allege in the second complaint? Well, Your Honor, again, Hampton and Selkow are instructive as to this point, what the government would need and what the government lacks in the Wisconsin case. In Hampton, we're talking about specific examples of fraud that were alleged by a bunch of subsidiaries of the parent company in a bunch of states all across the country. In Selkow, Judge Chantelle specifically hung in. So you're saying if they went and spoke to some folks in Wisconsin, that would not have uncovered the nationwide fraud? I think we have to limit the analysis and what the government would need to uncover fraud to the allegations in the complaint in Wisconsin. And when we look at the complaint in Wisconsin, there's such limited references to E-rate and to AT&T. But when they went to speak to an employee at Wisconsin Bell, they wouldn't have discovered that this was part of a corporate approach? They wouldn't have discovered that, you're saying? Again, Your Honor, under the test that applies here, we have to look at the allegations in our complaint. I'm saying the Department of Justice investigator travels to Wisconsin, sits down with an executive or someone, and starts asking questions. How many questions would he have had to ask before he found out that this is part of a corporate nationwide scheme? I think the answer is I don't know, and that's highly hypothetical, and that's the reason why we have to stick to the allegations in the complaint. And you're just saying there's no answer to it. You don't have any idea. I don't have an answer to that, Your Honor, because what we're instructed by are, Judge Chantelle said specifically in Selkow, what he found was the tip-off in that case were uniform billing practices. In other words, a corporate-wide scheme to defraud, right? We've got that in Hampton. We just do not have that in this case. And for this reason, it's just a step back. I guess I would have thought you would have said that maybe they would find a problem across Wisconsin, but it's hard to figure out how in asking for Wisconsin Bell documents they were going to uncover problems in Arizona or wherever all the other states are that they are. Illinois or Indiana or all the other states that you're suing. I think that's right, Your Honor. I think that their investigation would have been limited to what was provided to them with respect to the Wisconsin complaint and the allegations they're in. But there's nothing in the complaint that meaningfully talks about corporate-wide practices that were the same all over the country. There was nothing that tipped off AT&T Corp. misbehaving. This Wisconsin case is a bad apple case for sure, and when we're talking about what really our position is, we're not straying from precedent. In fact, we embrace Hampton. In fact, if there is an unprecedented expansion of the first-to-file rule that's being advocated, it's being advocated by the defendant, because really what we have here is a test that stays true to the first-to-file policies as well as to the reality of the situation. You cannot have looked at the Wisconsin complaint, the allegations they're in, and said to yourself, hmm, there must be something else going on on a much broader scale. And in that way, we maintain the precedence of Hampton. We maintain the precedence of Selco, Batiste. This is a case that remains true to those principles as well as to the goals of the first-to-file rule. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Millett, Edwards